Bank of Broadway, an Illinois Banking Corporation, Plaintiff, v. General Aluminum Door & Entrance Company, a Corporation, John C. Long, Inc., a Corporation, and Board of Education of the City of Chicago, a Body Politic and Corporate, Defendants.

Board of Education of the City of Chicago, a Body Politic and Corporate, Third Party Plaintiff, v. John C. Long, Inc., a Corporation, Counterplaintiff-Appellee, v. Board of Education of the City of Chicago, a Body Politic and Corporate, Counterdefendant-Appellant.

Gen. No. 51,110.

First District, First Division.

January 16, 1967.

Rehearing denied March 6, 1967.

James W. Coffey, of Chicago (Joseph A. Murphy, Richard E. Girard and Michael J. Murray, of counsel), for appellant.

Sydney G. Craig and W. B. Martin Gross, of Chicago (Martin, Craig, Chester & Sonnenschein, of counsel), for appellee.

MR. JUSTICE BURMAN delivered the opinion of the court.

This action was commenced by the Bank of Broadway, the original plaintiff, to establish a lien against the Board of Education of the City of Chicago, under a contract between the Board and John C. Long, Inc. for construction of a new school contiguous to an existing school building. The Board filed an answer, counterclaim and third party complaint naming as defendants Long, Long's surety, and certain other subcontractors who had also filed notices of liens against the same funds. The Board claimed damages of $22,038.57 against Long for repairs to the old School's boiler house resulting from damages to a sewer on the construction site and/or for a failure to properly shore the wall of the boiler house. Long filed a counterclaim against the Board seeking to recover $18,-683.78 over and above the contract price for additional shoring and $9,229.70 for extra work in connection with the installation of heating and ventilating ducts. The

Board's claim against Long and his counterclaim were heard by a Master who recommended that the Board not recover for repairs to the boiler house, and that Long recover for the duct work, but not for the shoring work. The trial court ruled against the Board's claim and entered judgment for Long on both the duct and shoring counterclaims. The Board brings this appeal contesting that part of the judgment which allowed recovery to Long for the shoring and duct work.

With respect to the shoring claim, the Board contends that Long was required by the contract to protect the existing school from damage by providing all necessary shoring, and therefore was not entitled to be paid extra for such work. The Board also argues that Long failed to prove the performance of any extra duct work over and above the contract requirements, and further that allowance of this extra would be in violation of the contract and state statutes.

We will first consider the circumstances surrounding Long's claim for additional shoring expense. The record shows that Long entered the successful low bid to construct a new school contiguous with and to replace an existing school, and the resulting written contract with the Board was agreed to on July 23, 1958. As contemplated by the contract [1] classes were held for 550 children

---

[1] Among the terms and conditions of the contract are the following provisions:

2. Wherever, in any portion of the Specifications authority is vested in the Architect or Engineer to approve extra work or changes or adjustment in the cost of the work, for whatever reason, or to approve extensions of time, it is understood that such authority is conditioned upon prior approval of the Board of Education of the City of Chicago, and that the Contractor if he selects, shall be justified in requesting proof of such approval.

1.03 EXTRAS: It is distinctly understood that no extra of any kind will be allowed, except such extra or extras as ordered by the architect in writing. In all cases where estimates for such

in the old school while the new school was being erected, and until it was fit for occupancy. The plans required a 15-foot excavation with the east wall of the new school $2\frac{1}{2}$ feet from and parallel to the old school's boiler room. Prior to the opening of the school term Long dug the excavation, and to support or "shore" the old boiler room, left a sloping embankment or "berm" three to five feet

extras have not been given in advance, itemized bills must be presented immediately upon completion of the extra work.

(a) The architect's Superintendents have no authority to order any extras.

1.05(b) The Contractor shall furnish all permanent and temporary bracing, shoring and anchoring that may be required to make everything absolutely stable and secure.

1.09(b) This Contractor will be held responsible and shall make good all damages to adjoining property, caused by the execution of his work under these specifications.

3.02 WORK INCLUDED: The Contractor under this section of the specifications shall furnish all labor, materials, services, supplies, tools, equipment and transportation necessary to do all the machine and hand excavating, clearing, shoring, filling and backfilling required for the foundations, footings, piers, pits, vaults, sidewalks, driveways, and do all filling, backfilling and rough grading to complete the site as shown on the drawings and hereinafter specified.

3.05 EXAMINATION OF SITE: The Contractor shall visit and examine the site and all conditions thereon and take into consideration all conditions which may affect his work.

3.08 SITE CONDITIONS: Previous buildings have occupied the site of the new building and the old foundations have been wrecked to within one foot six inches (1'–6") below the present grades. Contractor is cautioned to see to it that all old water connections, sewer and drain lines are properly cut off and capped before excavating for the new building. He shall also take into consideration that old foundations may be encountered in excavating for new work. No additional compensation will be allowed the contractor for the removal of any old foundation, floors, pipes, or rubbish encountered in excavating for the new work.

3.09(d) Do all necessary or required sheet piling, shoring and bracing of embankments and adjacent school building until foundation walls and backfilling is in place.

18

from the west wall of the boiler room which sloped down to a depth of fifteen feet at a 30-degree angle. When school opened the toilets in the old building were turned on and water was found accumulating in the excavation and washing away part of the protective berm. It was then discovered that a private sanitary sewer of the old building was located at a depth of six feet, three feet west and parallel to the wall of the old boiler room, and was connected to a visible manhole sewer near the excavation site. The sewer had been pierced while drilling holes for the caissons as required by the Board's plans, the sewer not being shown on the plans. Temporary repairs to stop the flow of water and prevent the washout of the berm proved unsuccessful and the Board rerouted the sewer. As a result of the washout Long erected wood shoring to support the berm, and later at the insistence of the Board he agreed to and did install steel sheet piling. Long incurred expenses of $18,683.78 for this additional shoring and steel piling which he claims is work not provided for in the contract or "extra" work.

The Board contends that Long performed no extra work, but was required by express provisions of the contract to examine the site and provide all necessary shoring to protect the school from damage. Long counters that the Board's plans and specifications were defective; that the Board made positive misrepresentations as to the conditions he would encounter; and that the Board is chargeable with knowledge of the sewer and is liable for failure to disclose its existence and location. Long argues that the Board is liable for the extra work performed by him because the plans prepared by the Board's architect failed to disclose that there was a private sewer where the caissons were to be drilled and for its refusal to shut off its toilets so as to prevent further washing out of the supporting berm.

It is established that the old school was constructed around 1886 and that some years later the Board con-

structed the private sewer, which the Board belatedly discovered it had a diagram for, but which located the sewer within the boiler room walls. It is also undisputed that Long had no knowledge of the existence of this sewer and that it was not shown in the plans and specifications. The charges that at the time the contract was signed the plans were defective and that misrepresentations were made have to be considered in light of the provisions of the contract.

The contract specifically provided that the contractor shall visit and examine the site and all conditions thereon and take into consideration all conditions which may affect his work. The contract also recited that previous buildings had occupied this site and that the contractor was required to see that all water connections, drain and sewer lines were cut off and capped. In the contract he acknowledged that he had examined and familiarized himself with the existing conditions of the premises which would affect the execution of his work.

On cross-examination Long testified that he had only visited the site once for about a half-hour before he was awarded the contract. He said that knowing there had been buildings on that site he had looked principally for old foundations that had to come out, and then stated:

> I looked at this boiler house and tried to see exactly where the building would be in regard to it. I also looked at the north end and just looked at the condition of the sidewalks, various flag poles and so on that had to come out. That is all that I can think of that I did.

██ ██ We are of the opinion that Long failed to properly inspect the premises as required by his contract and that his failure to do so was the cause of

his breaking into the Board's private sewer. While the plans did not indicate the sewer or show it to be elsewhere, it does not appear that there were misrepresentations upon which Long relied. Careful inspection would note the presence of manhole covers very close to the excavation site and in light of the warning in the contract proper caution would indicate a little digging which would have disclosed the troublesome sewer line. Under such an inspection provision the contractor was under an obligation to guard against damage from such cause, especially so where the condition could have been ascertained by the exercise of ordinary prudence. See McKay Engineering & Construction Co. v. Chicago Sanitary Dist., 348 Ill App 89, 108 NE2d 39. We agree with the Master that Long was required under his contract to do "all necessary" or "required" sheet piling, shoring and bracing of the embankment. We also believe, as did the Master who saw and heard the witnesses, that the claim that this was extra work is groundless under these facts and circumstances.

The second part of this appeal concerns the order allowing Long recovery for extra duct work in the amount of $9,229.70. The Board's theory is that Long failed to prove the performance of any extra work over and above his contractual requirements, and also contends that the Chancellor erred in allowing this claim because there was (1) no appropriation and no written authorization by the architect for this extra work, over and above the contract price, and (2) no approval of the extra work by the Board as required by section 34–19 of the School Code, and (3) no prior appropriation by the Board covering the extra, as required by section 34–49 of the School Code.

During construction of the school Long told the architect that the excavation and the concrete fill for the

21

duct work which he was ordered to do was not included in the contract. The architect informed Long by letter that "the excavation for and the concrete· fill around the duct work under the floor slab are part of the general work and shall be furnished by the General Contractor, John C. Long, Inc." Long claimed the sum of $16,991.04 for the extra cost of labor and materials in the excavation of trenches for duct work which it performed under protest and which it claimed as extra work.

The Master concluded that, while the contract did not specifically refer to excavating for duct work, excavation work in general was intended and that the general contractor was required to do all machine and hand excavating shown on the plans. The trenches for the duct work admittedly were shown on the plans. The Master found that Long was ordered by the architect's superintendent to dig the trenches for the duct work deeper and wider at some points than called for by the contract plans and drawings resulting in extra expense for labor and excess concrete, sand and membrane as shown by certain exhibits and recommended that Long be compensated in the amount of $9,221.70.

Under School Code section 34–19 (Ill Rev Stats 1965, c 122, § 34–19) it is provided that:

> [M]oney shall be appropriated or expended . . . only at the regular meetings of the board and by a vote of a majority of the full membership of the board.

In addition, School Code section 34–49 (Ill Rev Stats 1965, c 122, § 34–49) provides:

> No contract shall be made or expense or liability incurred by the board, . . . nor by any person for or in its behalf, notwithstanding the expenditure

may have been ordered by the board, unless an appropriation therefor has been previously made.

No evidence was offered to prove that a prior appropriation had been made by the Board for this alleged extra work above the contract price. Furthermore, the contract between Long and the Board specifically provided that no extra payments of any kind in addition to the original contract would be allowed "except as ordered in writing by the Board's architect and then only with the Board's prior approval for the expenditure." Not only was such a written order not given, but the evidence shows the architect immediately informed Long that it was obligated to do this work under its agreement.

█ Great Lakes Dredge Co. v. Chicago, 353 Ill 614, 188 NE 196, cited by Long in support of his contention that the Board waived the requirement of a written order is factually distinguishable. There the court stated that the involved work was admittedly required by unforeseen circumstances and did not come under the provisions of the contract. The court further held that the City, by standing by and without objecting, permitted this work to be done and accepted the benefits and thereby ratified the work. In the instant case we agree with the Master that there is no doubt that the contract terms included all necessary excavation work and that the trenches for the duct work were clearly shown on the plans. The Master also concluded that Long did the excavation for the duct work under protest, did not follow the general plans, but rather the orders of the heating and ventilating contractor, Mellish and Murray, as it was ordered to do by the architect's job superintendent. The Master then found that Long was entitled to that part of said expense attributable to the fact that the trenches were in some cases

dug deeper and wider than called for by the contract plans.

We have carefully reviewed the evidence and are of the opinion that Long failed to sustain the burden of proof of establishing that he did work on the ducts not generally included in his contract. Long did follow the orders of the heating and ventilating contractor, but H. James Murray who supervised that work for Mellish and Murray, testified on behalf of the Board that the ducts were installed exactly as required by the plans and specifications, and explained that had they put in the ducts any differently than called for in the plans it would have cost them a great deal in additional expense. He said that his company had not claimed any extra compensation for the work.

It may be that Long by becoming the successful bidder for the public improvement job entered into the contract improvidently, but nevertheless it is bound by the plain and unambiguous terms of the written agreement. Even in cases where the work was in fact extra and of considerable value and felt to be a hard case for the contractor, similar provisions in public construction contracts have been held binding .upon the parties. Plumley v. United States, 226 US 545.

For the reasons indicated in this opinion the judgment of the Circuit Court of Cook County is reversed.

Judgment reversed.

MURPHY, P. J. and ADESKO, J., concur.